```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
HEALING POWER INC.,

                        Plaintiff,              REPORT AND
                                                RECOMMENDATION

            -against-                           07-CV-4175 (NGG)

ACE CONTINENTAL EXPORTS
LIMITED, et al.,

                        Defendants.
----------------------------------------------------------------x
```

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Healing Power Inc. ("Healing Power" or "plaintiff") commenced this action for fraud and breach of contract on August 24, 2007, against defendants Ace Continental Exports Limited ("Ace") and Ramchandra Damle, a/k/a Ram Bhat Damle ("Damle"). On June 20, 2008, the Honorable Nicholas G. Garaufis ordered that a default judgment be entered against defendants, who had abandoned their defense of the case, and referred the matter to the undersigned magistrate judge for an inquest on damages. For the reasons explained below, this Court recommends that judgment be entered against defendants in the total amount of $216,896.22, plus prejudgment interest.

## BACKGROUND

Healing Power, a corporation organized in the state of New York, is owned by David Elias. See Complaint ("Compl.") ¶¶ 1, 4. David Elias entered into negotiations with defendants Ace and Damle for an exclusive distribution agreement regarding DB Care, an herbal dietary supplement. See Compl. ¶¶ 6-7. Damle claimed that Ace, a corporation organized in the United Kingdom, manufactured DB Care out of a plant it owned and operated

in India.  Compl. ¶¶ 2, 6.  On August 8, 2006, plaintiff and Ace entered into an exclusive distribution agreement ("Agreement") to sell DB Care in the United States.  Affidavit of Tsivia Elias in Support of Plaintiff's Damages on Default ("Elias Aff.") ¶¶ 11-12.  The Agreement represented that DB Care was "produced in premises owned by Ace, and that Ace is the owner of the production line, plant and any related machines and other items of personal property used in the production of DB Care."  Id. ¶ 14 (quoting Agreement ¶ 10.1.10).

After entering into the Agreement, plaintiff transferred $90,000 to Ace for the purchase of 3,000 bottles of DB Care, and $20,000 for the preparation of new labels for the DB Care bottles.  Compl. ¶¶ 12-13.  In order to create a new market for DB Care, plaintiff began the process of gaining approval for the importation of DB Care from the U.S. Food and Drug Administration and other regulatory bodies.  Elias Aff. ¶ 18.  In addition, plaintiff took the necessary steps to commence operation of an import business, including leasing an office and storage space, developing a website and other marketing operations, and setting up an administrative framework.  Id.

Plaintiff was approached around April of 2007 by numerous people who claimed to be the true owners of the rights to DB Care.  Compl. ¶ 17.  When confronted with these claims, Ace assured plaintiff that the claims were baseless and that Ace was taking legal action to deal with them.  Id. ¶ 18.  However, in July of 2007, Dhanvantary Health Care presented plaintiff with convincing evidence that neither Ace nor Damle were the actual owners of the production plant or the contractual rights associated with DB Care.  Id. ¶ 20.  Plaintiff also alleges, though not in the original complaint, that defendants attempted to divert plaintiff's customers to themselves by secretly placing a pamphlet in all bottles of DB Care that contained defendants'

direct contact information. Elias Aff. ¶ 27.

Plaintiff commenced the instant action on August 24, 2007, alleging fraud and breach of contract. See Compl. On October 5, 2007, defendants, through counsel, removed the case from state court based on diversity of citizenship. See 10/05/07 Notice of Removal. On February 8, 2008, after defendants failed to provide their counsel with information or discovery documents, and after they directed the law firm to stop all work on the case, the Court granted the firm's motion to withdraw as defendants' counsel. See 2/08/08 Docket Entry. Thereafter, defendants failed to respond to an Order to Show Cause why a default judgment should not be entered against them, see 3/31/08 Order to Show Cause, and the undersigned magistrate judge issued a Report and Recommendation on May 1, 2008, recommending that a default judgment be entered against them for abandoning their defense of the case and failing to prosecute their counterclaims. 5/01/08 Report and Recommendations. The Honorable Nicholas G. Garaufis adopted the Report and Recommendation in its entirety and directed that a default judgment be entered against defendants, with the amount of damages to be determined via an inquest by the undersigned magistrate judge. 6/20/08 Memorandum and Order.

## DISCUSSION

I.  **Damages for Fraud**

In a default judgment, all of the well-pleaded allegations in the complaint pertaining to liability are deemed to be admitted by the defendant. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 108 (2d Cir. 1997) (citations omitted). While the factual allegations in the complaint are accepted as true, the burden of proof rests

with the plaintiff to establish its damages. See Team Air Express, Inc. v. A. Heffco Techs., No. 06-CV-2742 (NG), 2008 WL 3165892, at *3 (E.D.N.Y. Aug. 6, 2008).

As its first cause of action in the instant complaint, plaintiff asserts a claim of fraudulent inducement based on the false representations knowingly made by Ace and Damle as to the ownership and rights relating to DB Care. See Compl. ¶¶ 22-25. Plaintiff claims to have reasonably relied on these representations when entering into the Agreement with Ace. Id. ¶ 25. According to New York law, which applies in this diversity action, the measure for damages in a fraud action is "the actual pecuniary loss sustained as a result of the wrong." Idrees v. Am. Univ. of the Caribbean, 546 F.Supp. 1342, 1350 (S.D.N.Y. 1982) (citing Ainger v. Mich. Gen. Corp., 476 F.Supp. 1209, 1233 (S.D.N.Y. 1979), aff'd, 632 F.2d 1025 (2d Cir. 1980); Jones Mem'l Trust v. TSAI Inv. Servs., Inc., 367 F.Supp. 491, 500 (S.D.N.Y.1973)). The "damages for fraud must be the direct, immediate, and proximate result of the fraudulent misrepresentation." Goldberg v. Mallinckrodt, Inc. 792 F.2d 305, 307 (2d Cir. 1986) (citations omitted).

Here, plaintiff has submitted the affidavit of Tsivia Elias, the president of Healing Power, which provides in some detail the expenses incurred by plaintiff as a result of the breach. Plaintiff has also submitted supporting documents, including a table summarizing bank statements that show plaintiff's expenses and income during the period in question. See Elias Aff. ¶ 19; Ex. C. The Elias Affidavit asserts that the sole purpose of the business was to sell DB Care, and that all expenses and losses of the business thus "were strictly related to that

product alone." Id. ¶ 25.[1] These expenses are therefore a direct and immediate result of the fraudulent misrepresentation by Damle and Ace, as plaintiff would not have entered into an agreement for the exclusive distribution rights of DB Care had it known that Ace was not the manufacturer of the product and had no intellectual property rights associated with the product. The conclusion then follows that plaintiff would not have developed a business and incurred associated business expenses had it known that Ace did not actually have the legal right to act as exclusive distributor of DB Care in the United States. Therefore, the total amount plaintiff expended as a result of defendants' fraudulent misrepresentation can be calculated by taking the total debits listed in the summary chart of the bank statements in Exhibit C (which the Elias Affidavit identifies as plaintiff's expenses), less an unspecified loan repayment to Tsivia Elias, and deducting from that amount the income and refunds or credits received by plaintiff. The resulting total of out-of-pocket business expenses incurred by plaintiff is $196,096.22.[2]

In addition, plaintiff requests damages in the form of its outstanding but unpaid expenses, which do not appear in the bank statements or accompanying chart. Elias Aff. ¶¶ 21-23. The first of these unpaid expenses is salary for Tsivia Elias, the president of the Healing Power, as well as that of his brother and father,[3] who did all of "the actual work"

---

[1] However, other than the submission of a year and a half worth of monthly bank statements showing all credits and debits, plaintiff does not specifically detail the nature of the expenses incurred, nor does it categorize the expenses reflected on the bank statements.

[2] The debits listed on the summary statement total $370,938.19 for the period in question, less the loan repayment of $33,750, less income of $139,240.36 and credits and refunds of $1,851.61. The total remaining expenses equal $196,096.22. See Elias Aff., Ex. C.

[3] Based on the information provided, it appears that Tsivia Elias' father is David Elias,
(continued…)

pertaining to the business. Elias Aff. ¶ 21. The relief requested is an average salary of at least $50,000 per year for each employee, for a period of one year, totaling $150,000. Id.

Although the aforementioned people may have performed work on behalf of Healing Power, that alone does not entitle plaintiff to recover the requested salaries. Even in connection with a default judgment, the court has an obligation to ensure that damages are appropriate and determined with reasonable certainty. See Transatlantic Marine Claims Agency, Inc., 109 F.3d at 111; Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) (citations omitted). In this case, plaintiff did not submit any additional evidence, such as contracts between plaintiff and its alleged employees, or any type of time sheet submitted by the employees, which would suggest that such salaries are owed to them. In fact, plaintiff failed to identify job titles for two of the three individuals[4] or job responsibilities for any of the three. The paucity of evidence as to salary suggests that the three did not expect or negotiate for a specific salary, but rather assumed it would be dependent on plaintiff's profit.

Salary for those engaged in starting a new business is not guaranteed, as it may turn on the ability of the new company to make a profit. See Howerton v. Grace Hosp., Inc., No. 4:90-CV-187, 1995 WL 787529, at *15 n.8 (W.D.N.C. July 7, 1995) (stating that "[m]any young businesses are not able to provide high salaries to their owners during the start up phase."). The assumption is that the work of the owner or those who are investing in the company will increase the value of their interest in the entity, thus providing compensation

---

[3](…continued)
plaintiff's owner. See Compl. ¶ 4.

[4] As previously noted, Tsivia Elias is identified as plaintiff's president.

through means other than traditional salary. See Aeolus Systems, LLC v. U.S., 79 Fed. Cl. 1, 4 (2007) ("It is certainly understandable that an owner of a small business would work for the business entity without receiving a salary or wages.") (quoting administrative record of the Small Business Administration).

The balance sheet submitted by plaintiff shows that in the year and a half in question in this case, the company spent $337,188.19 in expenses and received only $139,240.36 in income, indicating that plaintiff had yet to turn a profit from the sale of DB Care. See Elias Aff., Ex. C. Healing Power's failure to produce a profit suggests that notwithstanding defendants' fraud, plaintiff may not have been able to pay a salary to the employees in question. To be recoverable, out-of-pocket expenses awarded as fraud damages cannot be "merely speculative or conditional loss, and the plaintiff must demonstrate that they were proximately caused by the defendant's conduct." Idrees, 546 F.Supp. at 1350 (citing Sands v. Abelli, 290 F.Supp. 677, 681 (S.D.N.Y. 1968)). Plaintiff's failure to present additional evidence makes the requested salaries for the president and employees of the new company unsubstantiated as out-of-pocket expenses and too speculative to be recovered as pecuniary losses.

Another expense item for which plaintiff seeks recovery is the unpaid rent owed to A-1 Quality Limousine Service, LLC ("A-1"), for the rental of office and storage space during the period from August 2006 to August 2007. See Elias Aff. ¶ 22. Plaintiff has submitted an exhibit containing the lease between plaintiff and A-1, as well as a statement from A-1 indicating plaintiff's debt of $1,500 per month for the said period, resulting in a total amount due of $18,000. Id., Ex. E. In addition, the lease agreement states that the lessor has the right

to pursue claims against the owners of Healing Power individually if the rent is not paid. Id. The expense of renting office and storage space is common to most businesses and, as with the other business expenses, would likely not have been incurred had plaintiff not relied on Ace and Damle's representation that they granted plaintiff the exclusive right to sell DB Care in the United States. Accordingly, the $18,000 in rent should be recoverable as part of plaintiff's actual pecuniary loss.

The final unpaid expense identified by plaintiff consists of legal fees for services related to the negotiation of the distribution agreement and for the operation of the business. See Elias Aff. ¶ 23. Plaintiff has submitted a summary of its attorney's charges for legal services, which details the hours spent on the negotiations and research, as well as counsel's hourly rate. Elias Aff., Ex. F. The time billed by the attorney is documented as relating to the negotiations with Damle and Ace, as well as handling the challenges made by third parties to plaintiff's rights in DB Care, all of which occurred as a result of plaintiff's reliance on Ace and Damle's misrepresentations as to their ownership of intellectual rights regarding the product. See id. While the general rule is that attorney's fees are not recoverable as damages, New York law allows for an exception where the fraud exposed the plaintiff to litigation by a third party injured by the fraud. Goldberg, 792 F.2d at 309. In limited circumstances, a fraud victim may recover attorney's fees -- at least those predating the litigation alleging fraud -- "as out of pocket damages." AMC Film Holdings LLC v. Rosenberg, No. 03-CV-3835 (DRH), 2006 WL 2827860, at *5 (E.D.N.Y. Sept. 29, 2006) (quoting Kaleidoscope Media Group, Inc. v. Entm't Solutions, Inc., No. 97-CV-9369 (LTS), 2001 WL 849532, at *4 (S.D.N.Y. July 19, 2001)).

Here, the fees owed to the attorney are a direct and proximate effect of the misrepresentations made by Ace and Damle and the resulting challenges to plaintiff's rights in DB Care made by third parties, which could have resulted in litigation with those third parties. The fees sought do not involve those incurred in connection with the instant lawsuit. The attorney's fees are thus recoverable as part of the out-of-pocket expenses paid by plaintiff due to the fraud. The billing summary submitted by the plaintiff presents a reasonable amount of hours expended by the attorney, as well as an hourly rate of $200, found to be appropriate in comparable cases. See Team Air Express, Inc., 2008 WL 3165892, at *7. Plaintiff may therefore recover $2,800 in attorney's fees.

Based on the above calculations, this Court recommends that plaintiff be awarded $216,896.22 for pecuniary losses suffered by plaintiff as a result of defendants' fraud.

## II. Damages for Breach of Contract

### A. Failure to Convey Exclusive Distribution Rights

Plaintiff also includes a well-pleaded claim for breach of contract against Ace, based on Ace's failure to fulfill its obligation to grant plaintiff exclusive distribution rights of DB Care, as Ace was never in possession of such rights. Compl. ¶¶ 29-30. Ace's default is deemed to be a admission of plaintiff's factual allegations and hence a concession of liability on this claim. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp. 973 F.2d 155, 158 (2d Cir. 1992). The breach of contract claim is not governed by the Uniform Commercial Code ("U.C.C."), as the breach does not relate to the individual sale of goods between Ace and the plaintiff, but rather the parties' "distribution relationship." Cf. Milton Abeles, Inc. v. Farmers Pride, Inc., No. 03-CV-6111 (DLI), 2007 WL 2028069, at *11 (E.D.N.Y. July 11, 2007)

(holding that where cause of action is based on distribution relationship rather than sale of goods, U.C.C. Statute of Frauds provision does not apply).

Under New York law, damages for breach of contract should place the injured party in the position it would have occupied had the contract been fulfilled on its terms. See Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 384 (2d Cir. 2006) (citing Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003)). However, damages must be traceable to the breach and not merely speculative or possible. See 24/7 Records, Inc. v. Sony Music Entm't, Inc., No. 03-CV-3204 (MGC), 2008 WL 2791522, at *7 (S.D.N.Y. July 18, 2008) (citing Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261 (1986)). Had the contract between Ace and plaintiff been fulfilled according to its terms, plaintiff would have received the benefit of exclusive distribution rights to DB Care in the United States. Nevertheless, plaintiff has failed to present any evidence as to the alleged value of the exclusive distribution rights in the United States.

While lost profits may be a measure of damages for breach of contract, New York requires a plaintiff requesting such relief to show that "1) the damages were caused by the breach; 2) the alleged loss must be capable of proof with reasonable certainty, and 3) the particular damages were within the contemplation of the parties to the contract at the time it was made." Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 404 (1986) (citing Kenford Co., 67 N.Y.2d 257). Furthermore, New York applies a stricter standard for a start-up business seeking to recover lost profits, since the lack of a track record makes it difficult to estimate lost profits with the requisite certainty. See 24/7 Records, Inc., 2008 WL 2791522, at *7 (quoting Kenford Co. 67 N.Y.2d at 261). Here, Healing Power was a new business, having been

created solely for the distribution of DB Care, as arranged through the Agreement. See 7/11/08 Memorandum in Support of Plaintiff's Claim for Damages on Default ("Pl. Mem.") at 5. No proof was adduced that Healing Power ever made a profit during its existence; indeed, its balance sheet shows expenses totaling $337,188.19 during the period in question from January 2006 to August 2007, while the income from this same period totaled only $139,240.36. Elias Aff., Ex. C.

Plaintiff suggests a measure of lost profits based on the number of customers who purchased DB Care from plaintiff at least once and then ceased making purchases. Elias Aff. ¶ 28. In using this measure, plaintiff asks the Court to make an assumption, based on a single customer affidavit, that all 620 people who once purchased DB Care from Healing Power and then stopped are now purchasing the product from Ace, which secretly included defendants' contact information in the bottle. See Elias Aff. ¶¶ 27-29; Affidavit of Alex Witriol ("Witriol Aff."). Plaintiff projects that but for the breach, each of these 620 non-returning customers would have continued buying one bottle of DB Care each month for the entire fifteen-year term of the Agreement. Elias Aff. ¶ 32. Such speculation cannot be considered "reasonable certainty" under any interpretation of the evidence presented. One affidavit is certainly not sufficient to establish that each of the other 619 non-returning customers is also buying DB Care from defendant, and no further evidence has been presented to support such a conclusion. Customers may have chosen not to continue purchasing DB Care for a variety of other reasons, such as dissatisfaction with the product or change in economic circumstances. Even if plaintiff had proffered sufficient evidence to support its assumption as to why it lost its customers, it provides no proof whatsoever to indicate that all customers would have continued to buy one

bottle of DB Care per month for the next fifteen years.

Furthermore, even if the Court were to overlook the purely hypothetical nature of plaintiff's scenario, its calculation of lost profits is based on an incorrect formula, as courts "have generally rejected the use of gross receipts or gross profits as a means of establishing the value of a loss or injury to business interests." S.A.B. Enters., Inc. v. Vill. of Athens, 564 N.Y.S.2d 817, 822 (3d Dep't 1991) (citations omitted); see also Millenium Expressions, Inc. v. Chauss Mktg., Ltd., No. 02-CV-7545 (JCF), 2007 WL 950070, at *7 (S.D.N.Y. Mar. 30, 2007). Plaintiff's calculation of lost profits is predicated solely on the amount of gross receipts from customers, not the net profit. Plaintiff's measurements fail to take into account the costs of running a business, market fluctuations over the course of fifteen years and a host of other variables that would almost certainly change customers' purchasing patterns.

Finally, plaintiff presents no evidence that the lost profits were within the contemplation of the parties at the time of contract, another necessary element for the recovery of lost profits. See Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000). Nothing in the terms of the Agreement between Healing Power and Ace suggests that the parties contemplated the possibility of lost profits as damages.[5] Cf. Millenium Expressions, Inc., 2007 WL 950070, at *7 (holding that where either party was able to terminate a contract at any time, there was no contemplation of long-term liability and thus lost profits were not recoverable for breach of contract). Accordingly, even without plaintiff's purely speculative calculations on the amount

---

[5] In fact, the Agreement expressly states that upon termination of the Agreement for any reason, "the Distributor shall have no claim against the Manufacturer for compensation for loss of distribution rights, loss of goodwill or any similar loss." Agreement ¶ 12.4.

of lost profits, it cannot recover such damages as they were not within the contemplation of the parties at the time of contracting.

Under the circumstances of this case, the most accurate measure of damages for breach of contract would be the market value of the asset at the time of Ace's breach, as that formulation eschews the overly speculative measure of lost profits while taking into account the future value of the asset. See Schonfeld, 218 F.3d at 176. When the lost asset is a contract, its value can be measured by the contractual amount the plaintiff agreed to pay for the contract. See Point Prods. A.G. v. Sony Music Entm't, Inc., 215 F.Supp.2d 336, 346 (S.D.N.Y. 2002), as amended by No. 93 CIV. 4001 (NRB), 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) (amended to disallow lost assets claim for failure to state such theory in original claim). In Point Productions, the court determined that the appropriate measure of the losses resulting from the breach of a licensing agreement to sell music was the periodic payments negotiated under the contract. 215 F.Supp.2d at 346.

Here, plaintiff has not provided any information as to the actual value of the exclusive distribution contract, nor did plaintiff allege that it had paid a specific amount in exchange for the exclusive distribution rights.[6] Therefore, plaintiff has failed to proffer any reasonable

---

[6] Plaintiff's complaint and the Elias Affidavit both allege that after the execution of the Agreement, plaintiff transferred $90,000 to Ace, "for the purchase of 3,000 bottles of DB Care." Compl.¶ 12; Elias Aff.¶ 16. Plaintiff further claims that another $20,000 was transferred to Ace for "the preparation of new labels for the DB Care bottles." Compl.¶ 13; Elias Aff.¶ 17. The written contract is ambiguous as to whether there was a sum required from plaintiff in the amount of $45,000 as an advance on the products being purchased or as a separate payment. Agreement ¶ 3.1. However, plaintiff has submitted no other information about sums that may have been paid to Ace, nor does this information appear in the bank records submitted by plaintiff, as the records reflect no payments to Ace or Damle. See Elias
(continued…)

formula for determining those damages that would place it in the same economic position as if the contract had been fulfilled.[7] Accordingly, due to the lack of any non-speculative measure of damages, plaintiff cannot recover any damages under its claim that Ace breached its contractual obligation to grant plaintiff exclusive distribution rights of DB Care.

### B. Damages for Breach of Contract Based on Diversion of Customers

In its memorandum of law, plaintiff for the first time suggests that Ace breached the contract by "secretly diverting plaintiff's customers to itself and directly selling them DB Care." Pl. Mem. at 7. Plaintiff acknowledges that this breach of contract theory was "not pled specifically in the original Complaint" since plaintiff claims to have discovered it after the complaint was filed. Id. Even assuming *arguendo* that plaintiff's claim for breach of contract in the complaint provided sufficient notice to embrace this new theory, as required under Rule 8(a)(2) of the Federal Rules of Civil Procedure,[8] plaintiff fails to establish the necessary non-

---

[6](…continued)
Aff., Ex. D.

[7] Plaintiff's expenses as documented through the bank statements might be recoverable under a theory of rescission of the contract, which would return the parties to the status quo prior to the existence of the contract. See Morse/Diesel, Inc. v. Fid. & Dep. Co. of Md., 768 F.Supp. 115, 117 (S.D.N.Y. 1991). However, plaintiff did not plead rescission; furthermore, such a request would be inconsistent with plaintiff's claim of fraud, as the New York "election of remedies" doctrine does not allow for a contract to be simultaneously affirmed on a fraud theory and disaffirmed through rescission. Sofi Classic S.A. de C.V. v. Hurowitz, 444 F.Supp.2d 231, 238 (S.D.N.Y. 2006) (citations omitted).

[8] Under the liberal pleading standard of Rule 8(a)(2), a plaintiff must "disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'" Kittay v. Kornsteing, 230 F.3d 531, 541 (2d Cir. 2000) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)). In Malmsteen v. Berdon, the court dismissed the
(continued…)

speculative measure of damages or prove that such damages were within contemplation of the parties in entering the contract. See discussion *supra* page 12. Accordingly, plaintiff has no right to recover under its newly minted theory of breach of contract by diversion of its customers.

### III. Prejudgment Interest

New York law provides that prejudgment interest is mandatory for a common law fraud claim, such as the one asserted by plaintiff. See N.Y. C.P.L.R. § 5001; Strobl v. New York Mercantile Exch., 590 F.Supp. 875, 881 (S.D.N.Y. 1984), aff'd, 768 F.2d 22 (2d Cir. 1985). Interest is computed from the first date at which the cause of action accrued. See N.Y. C.P.L.R. § 5001(b). Here, plaintiff fails to provide any date from which to calculate the payment of prejudgment interest. However, plaintiff claims that "in or about July 2007" it discovered that defendants did not possess any of the intellectual property rights to DB Care, thus giving rise to the fraud claim. Elias Aff. ¶ 26. Although it could be argued that the fraud claim actually came into existence when Damle and Ace first made fraudulent statements to plaintiff or when the contract was entered into in August of 2006, plaintiff continued to incur

---

[8](…continued)
plaintiff's contract claim as insufficiently pled where plaintiff failed to specify "whether he is alleging a breach of explicit contractual provisions, and if so, what those provisions might say." 477 F.Supp.2d 655, 666 (S.D.N.Y. 2007). Here, plaintiff alleges in its complaint that defendants breached their contractual obligation to grant plaintiff exclusive distribution rights to DB Care in that defendants never possessed such rights. Compl. ¶¶ 29-30. Plaintiff's delay in articulating its theory that Ace breached the Agreement by diverting customers is particularly significant in that the new theory created an entirely different method to calculate loss based on the number of diverted customers; defendants -- who abandoned their defense of this action -- could not have anticipated that method of calculation from the complaint. Elias Aff. ¶¶ 27-32.

damages until July of 2007 when the fraud was actually discovered. Where, as here, damages are incurred at various periods of time, courts are granted "wide discretion" to adopt a reasonable date from which to calculate the interest. See Technest Holdings, Inc. v. Deer Creek Fund LLC, No. 06-CV-1665 (HBP), 2008 WL 3449941, at *22 (S.D.N.Y. Aug. 12, 2008) (quoting Conway v. Icahn & Co., Inc., 16 F.3d 504, 512 (2d Cir. 1994)). A reasonable date from which to calculate prejudgment interest is July 1, 2007, the date at which the damages became ascertainable due to the discovery of the fraud.

Prejudgment interest accrues on a simple interest basis at a rate of nine percent per year until entry of a final judgment. N.Y. C.P.L.R. §§ 5001, 5004; Technest Holdings, 2008 WL 3449941, at *22. Here, interest should be calculated on the total amount of damages plaintiff is to be awarded for the fraud, including $196,096.22 in business expenses, $18,000 in rent for the company office, and $2,800 in attorneys fees for the negotiation and execution of the Agreement. The sum of out-of-pocket expenses to be awarded as damages to plaintiff is $216,896.22. At nine percent per year starting from July 1, 2007, the prejudgment interest would accrue at a rate of $53.48 a day until the entry of a final judgment.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that a judgment be entered against defendants awarding plaintiff damages for the fraud claim in the amount of $216,896.22, plus prejudgment interest calculated upon entry of the final judgment in the manner described herein. Plaintiff has not established its entitlement to damages for the breach

of contract claim against Ace.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Judge Nicholas G. Garaufis on or before October 14, 2008. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(a); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

**Dated:    Brooklyn, New York**
**September 30, 2008**

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**